FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA 09 JUN -8 PM 4: 16

CASE NO.

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

**1:09-cv-0704SEB-JMS**

BERKSHIRE RESOURCES, L.L.C.,
BERKSHIRE (40L), L.L.P.,
BERKSHIRE 2006-5, L.L.P.,
PASSMORE-5, L.L.P.,
GUEYDAN CANAL 28-5, L.LP.,
GULF COAST DEVELOPMENT #12, L.L.P.,
DRILLING DEEP IN THE LOUISIANA WATER, J.V.,
JASON T. ROSE,
DAVID G. ROSE,
MARK D. LONG,
YOLANDA C. VELAZQUEZ

Defendants,

BRIAN C. ROSE AND JOYCE A. ROSE

Relief Defendants.
_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges and states as follows:

### INTRODUCTION

1. The Commission brings this action to enjoin Berkshire Resources, L.L.C. ("Berkshire"), its principals, Jason T. Rose and David G. Rose, the five limited liability partnerships and one joint venture through which Berkshire carried out an offering fraud – Berkshire (40L), L.L.P., Berkshire 2006-5, L.L.P., Passmore-5, L.L.P., Gueydan Canal 28-5, L.L.P., Gulf Coast

Development #12, L.L.P., Drilling Deep in the Louisiana Water, J.V. (collectively, the "Berkshire Offerings") – and Mark D. Long and Yolanda C. Velazquez, Berkshire's head sales agents, from continuing to defraud investors through the sale of securities in violation of the federal securities laws.

2. From April 2006 through December 2007, Berkshire raised approximately $15.5 million from about 265 investors in the U.S. and Canada through a series of unregistered, fraudulent offerings of securities in the form of "units of participation." The Defendants marketed the Berkshire Offerings to the public through cold calls, and at trade shows and "wealth expositions." The purported purpose of the Berkshire Offerings was to fund oil and gas development projects that Berkshire was to oversee.

3. Jason Rose was the public face of Berkshire and was held out as its lead manager with significant experience in the oil and gas industry. In reality, Jason Rose had no experience managing an oil and gas company, and David Rose, Jason's father, ran the company behind the scenes. David Rose has an extensive disciplinary history for securities fraud and is facing a criminal indictment in connection with another similar but unrelated oil and gas scam.

4. Berkshire, the Berkshire Offerings, Jason Rose, and David Rose also misled investors, among other things, about the use of investor proceeds. The Defendants assured investors they would use 100 percent of their funds for the oil and gas drilling projects. Contrary to these representations, Berkshire spent approximately $6.7 million on items having nothing to do with developing the projects, including its own payroll and outside sales commissions, as well as marketing and promotional expenses.

5. Moreover, of the $6.7 million, approximately $1.3 million went directly to members of the Rose family to pay for mortgages on their homes, home furnishings and electronics, cars,

plastic surgery, flying lessons, a Kentucky Derby party at Churchill Downs, and personal credit card charges.

6. To further their scheme, Jason and David Rose enlisted Velazquez and Long to run two boiler-room type sales offices on Berkshire's behalf; one in Lake Mary, Florida and the other in Jeffersonville, Indiana. Long and Velazquez received commissions for their sales efforts, despite the fact that neither they nor Berkshire were registered broker-dealers.

7. Through their conduct, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). In addition, Berkshire, Jason and David Rose violated Section 15(a) of the Exchange Act. As Berkshire's head sales agents, Long and Velazquez violated Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act. Based on the conduct alleged herein, Velazquez also violated Section 15(b)(6)(B)(i) of the Exchange Act by violating the prior Commission order against her. Unless enjoined, the Defendants are reasonably likely to continue to violate the securities laws.

## DEFENDANTS AND RELIEF DEFENDANTS

### Defendants

8. Berkshire is a Wyoming Limited Liability Company established in April 2006, with its principal place of business in Jeffersonville, Indiana. Berkshire purports to develop and operate gas and oil properties. Berkshire is the managing partner of the five limited liability partnerships and one joint venture described in Paragraphs 11 through 16 below. Berkshire has never been registered with the Commission in any capacity and has never registered any offerings of securities under the Securities Act or any class of securities under the Exchange Act. Securities regulators in

Washington and California issued cease-and-desist orders in March 2007 and June 2008, respectively, against Berkshire for fraud, offering unregistered securities, and employing unregistered sales agents.

9. David G. Rose, 58, resides in Louisville, Kentucky. He is the father of Jason and Brian Rose and the former husband of Joyce Rose. David Rose exercised *de facto* control over Berkshire and the Berkshire Offerings. State securities regulators in Kentucky, Oklahoma, and Massachusetts have issued cease-and-desist orders against David Rose and other oil and gas companies associated with him, in July 2005, February 2006, and April 2006, respectively, for fraud, offering unregistered securities, and employing unregistered sales agents. He also has a disciplinary history for various state securities law violations in the late 1980s. In January 2008, the United States Attorney's Office for the Western District of Kentucky secured an indictment against David Rose for mail and wire fraud, alleging he defrauded investors in two oil and gas well projects through his company, enTerra Energy, L.L.C. He is awaiting trial on those charges.

10. Jason T. Rose, 35, resides in Crestwood, Kentucky. He is identified in the Berkshire Offerings' materials as the "managing member" of Berkshire. State securities regulators in Washington and California issued cease-and-desist orders against him in connection with Berkshire, as described above.

11. Berkshire (40L), L.L.P. is a Wyoming Limited Liability Partnership organized in 2006. It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Oklahoma and Louisiana. Berkshire (40L) has never registered any securities or offerings with the Commission. It was also the subject of the Washington and California state actions against Berkshire described above.

12. Berkshire 2006-5, L.L.P. is a Wyoming Limited Liability Partnership organized in 2006. It purports to be a five-well, natural gas and crude oil drilling and development project, with wells located in Texas, Kansas, and Louisiana. Berkshire 2006-5 has never registered any securities or offerings with the Commission. It was also the subject of the California state action against Berkshire described above.

13. Passmore-5, L.L.P. is a Wyoming Limited Liability Partnership organized in 2006. It purports to be a five-well, natural gas and crude oil drilling project, with wells located in Texas. It has never registered any securities or offerings with the Commission.

14. Gueydan Canal 28-5, L.L.P. is a Wyoming Limited Liability Partnership organized in 2007. It purports to be a one-well, natural gas and crude oil drilling and development project located in Louisiana. It has never registered any securities or offerings with the Commission.

15. Gulf Coast Development #12, L.L.P. is a Wyoming Limited Liability Partnership organized in 2007. It purports to be a five-well natural gas and crude oil drilling and development project, with wells located in Texas. It has never registered any securities or offerings with the Commission.

16. Drilling Deep in the Louisiana Water, J.V. is a Wyoming Joint Venture organized in 2007. It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Louisiana. It has never registered any securities or offerings with the Commission.

17. Long, 52, resides in Louisville, Kentucky. Long was the head of sales at Berkshire and ran Berkshire's sales office in Jeffersonville, Indiana.

18. Velazquez, 39, resides in Winter Park, Florida. Velazquez was Berkshire's Client Services Director and ran Berkshire's sales office in Lake Mary, Florida. In April 2004, the Commission filed an emergency injunctive action in the Southern District of Florida against

Velazquez and others involved in a pump-and-dump scheme in which Velazquez operated an unregistered broker-dealer. In February 2005, by consent, the court enjoined Velazquez and ordered her to pay $425,000 in disgorgement and civil penalties. In March 2005, she consented to a Commission order barring her from the brokerage industry.

### Relief Defendants

19.     Brian C. Rose, 28, resides in Louisville, Kentucky. He owns and operates Jupiter Energy, LLC, an oil and gas company that purported to provide operational services to Berkshire. Berkshire channeled more than $431,000 in investor funds to him. In August 2007, Rose and others were permanently enjoined in an action Kentucky state securities regulators brought for failing to disclose the Rose family's disciplinary history, as described above, in an unrelated offering.

20.     Joyce A. Rose, 57, resides in Anchorage, Kentucky. Berkshire channeled more than $197,000 in investor funds to her.

### JURISDICTION AND VENUE

21.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

22.     This court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Indiana because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred there. During the relevant time period, Berkshire maintained its principal office in Jeffersonville, Indiana, and Long and a team of sales agents solicited investors and mailed investors offering materials from that office. Jason Rose worked there and David Rose controlled its operations. The firm purportedly contracted with Brian Rose's company, and provided money to him and Joyce Rose. Velazquez was employed by

Berkshire, and on at least one occasion personally visited the Jeffersonville office and trained sales agents there.

23. In connection with the conduct alleged in the Complaint, the Defendants, directly or indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## FACTS

### A. Background

24. In April 2006, David Rose formed Berkshire as a vehicle to raise capital, under the guise of developing and managing natural gas and crude oil properties. He installed Jason Rose as the head of the company, giving him the title "managing member."

25. In conjunction with that title and from its inception, Berkshire held Jason Rose out as the head manager in charge of the day-to-day affairs and business of the company. In reality, although Jason Rose regularly worked in the Jeffersonville office, he did little more than help send out Berkshire's offering materials to investors. David Rose employed individuals whom he had employed at other companies to help administer Berkshire, and directed the company behind the scenes.

26. Berkshire formed and operated five limited partnerships and a joint venture that purportedly were involved with oil and gas development projects in Kansas, Louisiana, Oklahoma, and Texas. Berkshire was the managing partner of each of the partnerships and the joint venture, with responsibility for the drilling and operation of each project.

27. In connection with these projects, Berkshire purportedly contracted with Jupiter Energy, L.L.C. ("Jupiter"), an oil and gas company Brian Rose owned, and enTerra Energy, L.L.C.

7

("enTerra"), an oil and gas company David Rose owned and through which he operated the scam alleged in his criminal indictment.

### B. The Fraudulent Offerings

28.  Between April 2006 and December 2007, Berkshire raised approximately $15.5 million from the offer and sale of "units of participation" in the Berkshire Offerings to approximately 265 investors in the U.S. and Canada. No registration statement was filed or in effect with the Commission for the securities. The Berkshire Offerings ranged in size from 14 to 137 investors per offering.

29.  Berkshire marketed the offerings at trade shows and "wealth expositions." The typical sales pitch was that Berkshire was "the best in the business," that it had a "foolproof" investment opportunity, and that investors would receive a "quick payback" on their investment. At these trade shows and wealth expositions, the Defendants, including David Rose, took some prospective investors to private hotel suites for one-on-one meetings during which they gave investors offering materials and subscription agreements for the particular partnership or joint venture.

30.  Berkshire also marketed the offerings through cold calls sales agents made from two boiler-room type sales offices. Berkshire hired Long to run its Jeffersonville, Indiana operation, and tapped Velazquez to head up the Lake Mary, Florida operation. After they received training from Long and Velazquez, sales agents called potential investors from lists and used detailed scripts to make their sales pitch. Long and Velazquez also monitored the calls and, when necessary, stepped in to close the deal. Berkshire paid its sales agents a weekly salary and a commission based on a percentage of sales. Long and Velazquez also received commissions for their own sales and those made by the sales agents in their office.

31. After meeting with prospective investors, Berkshire sent them a private placement memorandum ("PPM") for the particular partnership or joint venture in which they were being solicited, a purchaser suitability questionnaire, and a subscription and customer agreement. Jason Rose was involved in sending these materials to investors. Some investors also received a DVD detailing Berkshire's background and experience in the oil and gas industry.

32. Initially, the Defendants deposited investor funds in the applicable partnership or joint venture bank account. Shortly afterwards, however, the Defendants transferred those funds to Berkshire's bank account, allegedly to pay the costs of buying the running the wells.

33. Berkshire sent investors stock certificates reflecting their investment in the particular partnership or joint venture. Sporadically, through Berkshire's web site and by mail, investors received company updates, including whether certain wells had purportedly produced oil or were "dry holes," when the Defendants would mail distribution checks, and other information regarding the Berkshire Offerings.

34. Sales scripts the Defendants provided to the agents in Florida and Indiana promised investors they would make returns of 60% to 80%, beginning 6 to 12 months after an investor recouped his or her invested capital.

35. In at least one offering, Drilling Deep, Berkshire told investors it already had a well that was producing at a rate of about $600,000 per month, and that investors could expect a "full or near full return" of their invested capital "very quickly" and within the first year.

36. More than two years after the Drilling Deep offering, investors had only received back an average of approximately seven percent of invested capital. In total, as of August 2008, Berkshire had distributed a mere $375,000 of investors' invested capital, or approximately 2.5 percent of the total money raised. In April 2009, Berkshire issued bad checks to investors and

refused to answer phone calls. Not a single investor has received any profit from any of the Berkshire Offerings.

C. **Misrepresentations and Omissions**

1. **False and Misleading Statements Regarding the Use of Proceeds**

37. Berkshire's sales agents told prospective investors the Defendants would use 100 percent of their money to fund the partnerships and joint venture, and to run the oil and gas development projects. The Defendants reiterated this representation in the PPMs. The offering materials, with one exception, also explicitly stated the Defendants would not use any funds for sales expenses, commissions, organizational expense, or due diligence fees.

38. In direct contravention of these representations, Berkshire spent at least $6.7 million of investor funds for exactly these purposes. Of this amount, approximately $1.3 million in investor funds went directly to the Rose family, including at least $160,000 to Jason Rose, $431,000 to Brian Rose, $192,000 to Joyce Rose, and $56,000 to David Rose. The Defendants used another $255,000 to cover personal charges the Rose family made on David Rose's American Express Black card. An additional $203,000 covered other miscellaneous credit card charges. The Rose family used investor money as their own personal slush fund to pay for mortgages, home furnishings and electronics, cars bought at auction, plastic surgery for David Rose, flying lessons for Brian Rose, and a Kentucky Derby party at Churchill Downs.

39. Berkshire improperly used approximately $3.6 million of investor money to fund its payroll, including paying salaries of employees and consultants, and to make commission payments to Long, Velazquez, and other Berkshire sales agents. In addition, contrary to what the Defendants and their sales agents told investors, Berkshire used approximately $1.83 million of investor funds

to pay for various business expenses, including marketing and promotional materials, advertising, and shipping costs.

### 2. Misrepresentations Regarding the Management of Berkshire

40. The Berkshire Offerings' PPMs misled investors about who was managing the company's operations. While the offering materials stated that Jason Rose managed and operated Berkshire and the Berkshire Offerings, Jason Rose did nothing more than send offering materials to investors.

41. The truth is David Rose was the real operating force behind the company and its offerings. He formed Berkshire and set it up to operate exactly like his previous oil and gas companies, and was the one who told Jason Rose he would be "managing member." However, he did not give Jason Rose any formal job duties. Instead, he hired employees from his previous companies to administer Berkshire's day-to-day operations. When Berkshire decided to open a sales office in Florida, it moved into office space belonging to David Rose's enTerra.

42. David Rose, in contrast to his son, had contact with investors and was actively involved in soliciting them. He attended at least one trade show with prospective investors during which he touted the company and its investment potential. Despite the fact that he did not have signatory authority on any of Berkshire's bank accounts, David Rose wrote and signed checks drawn on Berkshire's operating account for his benefit on multiple occasions.

### 3. False and Misleading Statements Concerning Jason Rose's Experience and Success in the Oil and Gas Industry

43. The Berkshire Offerings' PPMs, as well as the DVD provided to some investors, held Jason Rose out as the managing member of Berkshire. The company's materials claimed he "earned accolades for his tremendous attention to every detail, including research into hundreds of drill sites and hand picking the select few that Berkshire Resources ultimately drilled." The offering

materials also asserted that Jason Rose would be responsible for "coordinating the acquisition of oil and gas properties and leases, funding, drilling, completing and operating wells."

44.     Similarly, sales agents told prospective investors that Jason Rose had been involved in the evaluation, site selection and drilling of "70 oil and/or natural gas wells" in the previous three years alone, and that he "hit 63 of the 70 wells drilled . . . for an incredible industry benchmark of 90 percent." A list of all of the wells Jason Rose purportedly "hit" during his time in the oil and gas industry was also attached to the PPMs.

45.     In truth, Jason Rose's only experience in the oil and gas industry was limited to manual tasks such as painting batteries, setting up pump jacks, and laying gas lines. He was paid a salary as Berkshire's "managing member" merely to show up to the Jeffersonville office, where he helped send out PPMs and other offering materials. Meanwhile, his father, David Rose, ran the company behind the scenes.

## CLAIMS FOR RELIEF

### COUNT I

**Sale of Unregistered Securities in Violation of
Sections 5(a) and 5(c) of the Securities Act by All Defendants**

46.     The Commission repeats and realleges Paragraphs 1 through 36 and 40 through 42 of this Complaint as if fully set forth herein.

47.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint, and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

48.     From at least April 2006 through December 2007, the Defendants, directly or indirectly: (a) made use of the means or instruments of transportation or communication in

interstate commerce or the mails to sell securities, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, without a registration statement having been filed or being in effect with the Commission as to such securities.

49. By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act by Berkshire, the Berkshire Offerings, Jason Rose, and David Rose

50. The Commission repeats and realleges Paragraphs 1 through 45 of this Complaint as if fully set forth herein.

51. From at least April 2006 through December 2007, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose directly and indirectly, by use of the means or instruments of transportation or communication in interstates commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

52. By reason of the foregoing, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose, directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. §77q(a)(1).

## COUNT III

**Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act by Berkshire, the Berkshire Offerings, Jason Rose, and David Rose**

53. The Commission repeats and realleges Paragraphs 1 through 45 of this Complaint as if fully set forth herein.

54. From at least April 2006 through December 2007, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

55. By reason of the foregoing, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§77q(a)(2) and 77q(a)(3).

## COUNT IV

**Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by Berkshire, the Berkshire Offerings, Jason Rose, and David Rose**

56. The Commission repeats and realleges Paragraphs 1 through 45 of this Complaint as if fully set forth herein.

14

57.     From at least April 2006 through December 2007, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose, directly or indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

58.     By reason of the foregoing, Berkshire, the Berkshire Offerings, Jason Rose, and David Rose directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5.

## COUNT V

### Violations of Section 15(a) of the Exchange Act by Berkshire, Jason Rose, David Rose, Long, and Velazquez

59.     The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint as if fully set forth herein.

60.     By contacting investors to encourage them to purchase Berkshire securities and by compensating Long and Velazquez with commissions, Berkshire, Jason Rose, David Rose, Long, and Velazquez acted as brokers-dealers and made use of the mails or other means or instruments of interstate commerce to effect transactions in, or induce the purchase of, securities.

61.     Berkshire is not registered with the Commission as a broker or dealer, nor are Jason Rose, David Rose, Long or Velazquez.

62. By reason of the foregoing, Berkshire, Jason Rose, David Rose, Long, and Velazquez, and each of them, violated and, unless enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### COUNT VI

### Violation of Section 15(b)(6)(B)(i) of the Exchange Act by Velazquez

63. The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint as if fully set forth herein.

64. From at least August 2006 to August 2007, Velazquez acted as a broker by participating in an offering of securities by inducing and attempting to induce investors to purchase Berkshire securities and receiving transaction-based compensation for her efforts in contravention of a Commission order barring her from associating with any broker or dealer.

65. By reason of the foregoing, Velazquez violated and, unless enjoined, is reasonably likely to continue to violate, Section 15(b)(6)(B)(i) of the Exchange Act, 15 U.S.C. § 78o(b)(6)(B)(i).

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that the Defendants have committed the violations of the federal securities laws alleged herein.

## II.

### **Permanent Injunction**

Issue a Permanent Injunction, restraining and enjoining:

(1)   Berkshire, Jason Rose, and David Rose from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act, and Rule 10b-5 thereunder;

(2)   The Berkshire Offerings from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

(3)   Long from violating Sections 5(a) and 5(c) of the Securities Act, and Section 15(a) of the Exchange Act; and

(4)   Velazquez from violating Sections 5(a) and 5(c) of the Securities Act, and Sections 15(a) and 15(b)(6)(B)(i) of the Exchange Act.

## III.

### **Sworn Accountings**

Issue an Order requiring the Defendants and Relief Defendants to file with this Court sworn written accountings.

## IV.

### **Disgorgement**

Issue an Order directing the Defendants and Relief Defendants to disgorge ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conducted alleged in the Complaint.

## V.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

June 5, 2009          By:     /s/ Ian A.

C. Ian Anderson
Senior Trial Counsel
New York Reg. No. 2693067
Direct Dial: (305) 982-6317
E-mail: andersonci@sec.gov
***Lead Counsel***

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154