UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

CASE NO. 1:09-0704-SEB-JMS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BERKSHIRE RESOURCES, L.L.C.,
BERKSHIRE (40L), L.L.P.,
BERKSHIRE 2006-5, L.L.P.,
PASSMORE-5, L.L.P.,
GUEYDAN CANAL 28-5, L.L.P.,
GULF COAST DEVELOPMENT #12, L.L.P.,
DRILLING DEEP IN THE LOUISIANA WATER, J.V.,
JASON T. ROSE,
DAVID G. ROSE,
MARK D. LONG,
YOLANDA C. VELAZQUEZ,

Defendants,

BRIAN C. ROSE AND JOYCE A. ROSE,

Relief Defendants.
_____/

**PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AGAINST CERTAIN DEFENDANTS**

Plaintiff Securities and Exchange Commission, pursuant to Federal Rule of Civil Procedure 55(b)(2), moves for entry of a Default Judgment of Permanent Injunction and Other Relief Against Defendants Berkshire Resources, L.L.C. ("Berkshire"), Berkshire (40L), L.L.P., Berkshire 2006-5, L.L.P., Passmore-5, L.L.P., Gueydan Canal 28-5, L.L.P., Gulf Coast Development #12, L.L.P., and Drilling Deep In the Louisiana Water, J.V. (the "Berkshire Offerings," and with Berkshire, the "Berkshire Defendants") and states:

## I. INTRODUCTION

The Commission brought this action to enjoin Berkshire, its principals, Jason T. Rose and David G. Rose, the five limited liability partnerships and one joint venture through which Berkshire carried out an offering fraud (the Berkshire Offerings), and Mark D. Long and Yolanda Velazquez, Berkshire's head sales agents, from continuing to defraud investors through the sale of securities in violation of the federal securities laws.  The Commission also named as relief defendants in the action Brian C. Rose and Joyce A. Rose.

As alleged in the Complaint, from April 2006 through December 2007, Berkshire raised approximately $15.5 million from about 265 investors in the U.S. and Canada through a series of unregistered, fraudulent offerings of securities in the form of "units of participation" in the Berkshire Offerings.  The Defendants marketed the Berkshire Offerings to the public through cold calls, and at trade shows and "wealth expositions."  The purported purpose of the Berkshire Offerings was to fund oil and gas development projects that Berkshire was to oversee.

As discussed below, on the basis of the allegations in the Complaint, the Commission is entitled to the entry of a default judgment permanently enjoining the Berkshire Defendants from future violations of the federal securities laws.  Counsel for the Commission also requests an additional 120 days to obtain authority from the Commission to seek a specific penalty amount against the Berkshire Defendants, at which time the Commission will move for a Final Judgment imposing a penalty and requiring disgorgement of ill-gotten gains.

## II.  HISTORY OF THE CASE

The Commission filed its Complaint June 9, 2009 [D.E. 1], alleging, among other things, that the Berkshire Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), Section 17(a) of the Securities Act, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5.  On June 23, 2009, the Commission served each of the Berkshire Defendants [D.E. 28-33] with a copy of the Summons and Complaint.  On October 16, 2009, the Clerk of the Court entered a default against the Berkshire Defendants [D.E. 43].

## III.  MEMORANDUM OF LAW

**A.   Legal Standards**

The factual allegations of a complaint are deemed true and admitted by the entry of a default.  *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *Buchanan v. Bowman*, 820 F.2d 359, 360 (11th Cir. 1987); *Nishimatsu Construction Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  "As a general rule, a 'default judgment establishes, as a matter of law, that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint.'"  *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.,* 722 F.2d 1319, 1323 (7th Cir. 1983) (quoting *Bruer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir. 1982)); *Buchanan*, 820 F.2d at 360 (accord).  As discussed below, the factual allegations of the Complaint support the entry of a default judgment against the Berkshire Defendants permanently enjoining them from future violations of the federal securities laws.

3

B.     **Factual Allegations of the Complaint Deemed Admitted Against Berkshire Defendants**

    1.     **The Defendants**

**Berkshire** is a Wyoming Limited Liability Company established in April 2006, with its principal place of business in Jeffersonville, Indiana. (Complaint ¶ 8). Berkshire purports to develop and operate gas and oil properties, and is the managing partner of the five limited liability partnerships and one joint venture described below (the Berkshire Offerings). Berkshire has never been registered with the Commission in any capacity and has never registered any offerings of securities under the Securities Act or any class of securities under the Exchange Act. (*Id.*). Securities regulators in Washington and California issued cease-and-desist orders in March 2007 and June 2008, respectively, against Berkshire for fraud, offering unregistered securities, and employing unregistered sales agents. (*Id.*).

**David G. Rose**, 58, resides in Louisville, Kentucky. (Complaint ¶ 9). He is the father of Jason and Brian Rose and the former husband of Joyce Rose. Rose exercised *de facto* control over Berkshire and the Berkshire Offerings. (*Id.*). State securities regulators in Kentucky, Oklahoma, and Massachusetts issued cease-and-desist orders against David Rose and other oil and gas companies associated with him, in July 2005, February 2006, and April 2006, respectively, for fraud, offering unregistered securities, and employing unregistered sales agents. (*Id.*). He also has a disciplinary history for various state securities law violations in the late 1980s. In January 2008, the United States Attorney's Office for the Western District of Kentucky secured an indictment against Rose for mail and wire fraud, alleging he defrauded investors in two oil and gas well projects through his company, enTerra Energy, L.L.C. (*Id.*).

**Jason T. Rose**, 35, resides in Crestwood, Kentucky. (Complaint ¶ 10). He is identified in the Berkshire Offerings' materials as the "managing member" of Berkshire. State securities

regulators in Washington and California issued cease-and-desist orders against him in connection with Berkshire. (*Id.*).

**Mark Long**, 52, resides in Louisville, Kentucky. Long was the head of sales at Berkshire and ran Berkshire's sales office in Jeffersonville, Indiana. (*Id.* ¶ 17).

**Yolanda Velazquez**, 39, resides in Winter Park, Florida. Velazquez was Berkshire's Client Services Director and ran Berkshire's sales office in Lake Mary, Florida. (*Id.* ¶ 18).

**Berkshire (40L), L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 11). It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Oklahoma and Louisiana. Berkshire 40(L) has never registered any securities or offerings with the Commission. It was also the subject of the Washington and California state actions against Berkshire described above. (*Id.*).

**Berkshire 2006-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 12). It purports to be a five-well, natural gas and crude oil drilling and development project, with wells located in Texas, Kansas, and Louisiana. Berkshire 2006-5 has never registered any securities or offerings with the Commission. It was also the subject of the California state action against Berkshire described above. (*Id.*).

**Passmore-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 13). It purports to be a five-well, natural gas and crude oil drilling project, with wells located in Texas. It has never registered any securities or offerings with the Commission. (*Id.*).

**Gueydan Canal 28-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2007. (Complaint ¶ 14). It purports to be a one-well, natural gas and crude oil drilling and development project located in Louisiana. It has never registered any securities or offerings with the Commission. (*Id.*).

**Gulf Coast Development #12, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2007. (Complaint ¶ 15). It purports to be a five-well natural gas and crude oil drilling and development project, with wells located in Texas. It has never registered any securities or offerings with the Commission. (*Id.*).

**Drilling Deep in the Louisiana Water, J.V.** is a Wyoming Joint Venture organized in 2007. (Complaint ¶ 16). It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Louisiana. It has never registered any securities or offerings with the Commission. (*Id.*).

### 2. The Fraudulent Unregistered Offerings

In April 2006, David Rose formed Berkshire as a vehicle to raise capital, under the guise of developing and managing natural gas and crude oil properties. (Complaint ¶ 24). He installed his son, Jason Rose, as the head of the company, giving him the title "managing member." (*Id.*). Jason Rose was the public face of Berkshire and was held out as its lead manager with significant experience in the oil and gas industry. In reality, Jason Rose had no experience managing an oil and gas company, and David Rose, Jason's father, ran the company behind the scenes. (*Id.* ¶¶ 3, 25).

Berkshire formed and operated five limited partnerships and a joint venture that purportedly were involved with oil and gas development projects in Kansas, Louisiana, Oklahoma, and Texas. (Complaint ¶ 26). Berkshire was the managing partner of each of the partnerships and the joint venture, with responsibility for the drilling and operation of each project. (*Id.*).

Between April 2006 and December 2007, Berkshire raised approximately $15.5 million from the offer and sale of "units of participation" in the Berkshire Offerings to approximately 265 investors in the U.S. and Canada. (Complaint ¶¶ 2, 28). No registration statement was filed or in

effect with the Commission for the securities.  The Berkshire Offerings ranged in size from 14 to 137 investors per offering.  (*Id.* ¶ 28).

Berkshire marketed the offerings at trade shows and "wealth expositions."  (Complaint ¶ 29).  The typical sales pitch was that Berkshire was "the best in the business," that it had a "foolproof" investment opportunity, and that investors would receive a "quick payback" on their investment.  (*Id.*).  At these trade shows and wealth expositions, the Defendants, including David Rose, took some prospective investors to private hotel suites for one-on-one meetings during which they gave investors offering materials and subscription agreements for the particular partnership or joint venture.  (*Id.*).

Berkshire also marketed the offerings through cold calls sales agents made from two boiler-room type sales offices.  (Complaint ¶ 30).  Berkshire hired Long to run its Jeffersonville, Indiana operation, and tapped Velazquez to head up the Lake Mary, Florida operation.  (*Id.*).  After they received training from Long and Velazquez, sales agents called potential investors from lists and used detailed scripts to make their sales pitch.  Long and Velazquez also monitored the calls and, when necessary, stepped in to close the deal.  (*Id.*).

After meeting with prospective investors, Berkshire sent them a private placement memorandum ("PPM") for the particular partnership or joint venture in which they were being solicited, a purchaser suitability questionnaire, and a subscription and customer agreement.  Jason Rose was involved in sending these materials to investors.  (Complaint ¶ 31).  Some investors also received a DVD detailing Berkshire's background and experience in the oil and gas industry.  (*Id.*).

Initially, the Defendants deposited investor funds in the applicable partnership or joint venture bank account.  (Complaint ¶ 32).  Shortly afterwards, however, the Defendants transferred those funds to Berkshire's bank account, allegedly to pay the costs of buying and running the wells.

(*Id.*).  Berkshire sent investors stock certificates reflecting their investment in the particular partnership or joint venture.  (*Id.* ¶ 32).  Sporadically, through Berkshire's web site and by mail, investors received company updates, including whether certain wells had purportedly produced oil or were "dry holes," when the Defendants would mail distribution checks, and other information regarding the Berkshire Offerings.  (*Id.*).

Sales scripts the Defendants provided to the agents in Florida and Indiana promised investors they would make returns of 60% to 80%, beginning 6 to 12 months after an investor recouped his or her invested capital.  (Complaint ¶ 34).  In at least one offering, Drilling Deep, Berkshire told investors it already had a well that was producing at a rate of about $600,000 per month, and that investors could expect a "full or near full return" of their invested capital "very quickly" and within the first year.  (*Id.* ¶ 35).

More than two years after the Drilling Deep offering, investors had only received back an average of approximately seven percent of invested capital.  (Complaint ¶ 36).  In total, as of August 2008, Berkshire had distributed a mere $375,000 of investors' invested capital, or approximately 2.5 percent of the total money raised.  In April 2009, Berkshire issued bad checks to investors and refused to answer phone calls.  Not a single investor has received any profit from any of the Berkshire Offerings.  (*Id.*).

       **2.**      <u>**Misrepresentations and Omissions**</u>

            **a.**      **False and Misleading Statements Regarding the Use of Proceeds**

Berkshire's sales agents told prospective investors the Defendants would use 100 percent of their money to fund the partnerships and joint venture, and to run the oil and gas development projects.  (Complaint ¶ 37).  The Defendants reiterated this representation in the PPMs.  (*Id.*).  The

offering materials, with one exception, also explicitly stated the Defendants would not use any funds for sales expenses, commissions, organizational expense, or due diligence fees. (*Id.*).

In direct contravention of these representations, Berkshire spent at least $6.7 million of investor funds for exactly these purposes. (Complaint ¶ 38). Of this amount, approximately $1.3 million in investor funds went directly to the Rose family, including at least $160,000 to Jason Rose, $431,000 to Brian Rose, $192,000 to Joyce Rose, and $56,000 to David Rose. The Defendants used another $255,000 to cover personal charges the Rose family made on David Rose's American Express Black card. An additional $203,000 covered other miscellaneous credit card charges. (*Id.*). The Rose family used investor money as their own personal slush fund to pay for mortgages, home furnishings and electronics, cars bought at auction, plastic surgery for David Rose, flying lessons for Brian Rose, and a Kentucky Derby party at Churchill Downs. (*Id.*).

Berkshire improperly used approximately $3.6 million of investor money to fund its payroll, including paying salaries of employees and consultants, and to make commission payments to Long, Velazquez, and other Berkshire sales agents. (Complaint ¶ 39). In addition, contrary to what the Defendants and their sales agents told investors, Berkshire used approximately $1.83 million of investor funds to pay for various business expenses, including marketing and promotional materials, advertising, and shipping costs. (*Id.*).

### b.     Misrepresentations Regarding the Management of Berkshire

The Berkshire Offerings' PPMs misled investors about who was managing the company's operations. (Complaint ¶ 40). While the offering materials stated Jason Rose managed and operated Berkshire and the Berkshire Offerings, Jason Rose did nothing more than send offering materials to investors. (*Id.*). David Rose was the real operating force behind the company and its offerings. He formed Berkshire and set it up to operate exactly like his previous oil and gas

companies, and told Jason Rose he would be "managing member." (*Id.* ¶ 41). Despite the fact that he did not have signatory authority on any of Berkshire's bank accounts, David Rose wrote and signed checks drawn on Berkshire's operating account for his benefit on multiple occasions. (*Id.* ¶ 42).

The Berkshire Offerings' PPMs, as well as the DVD provided to some investors, held Jason Rose out as the managing member of Berkshire. (Complaint ¶ 43). The company's materials claimed he "earned accolades for his tremendous attention to every detail, including research into hundreds of drill sites and hand picking the select few that Berkshire Resources ultimately drilled." The offering materials also asserted that Jason Rose would be responsible for "coordinating the acquisition of oil and gas properties and leases, funding, drilling, completing and operating wells." (*Id.*).

Similarly, sales agents told prospective investors that Jason Rose had been involved in the evaluation, site selection and drilling of "70 oil and/or natural gas wells" in the previous three years alone, and that he "hit 63 of the 70 wells drilled . . . for an incredible industry benchmark of 90 percent." (Complaint ¶ 44). A list of all of the wells Jason Rose purportedly "hit" during his time in the oil and gas industry was attached to the PPMs. (*Id.*).

In truth, Jason Rose's only experience in the oil and gas industry was limited to manual tasks such as painting batteries, setting up pump jacks, and laying gas lines. (Complaint ¶ 45). He was paid a salary as Berkshire's "managing member" merely to show up to the Jeffersonville office, where he helped send out PPMs and other offering materials. Meanwhile, his father, David Rose, ran the company behind the scenes. (*Id.*).

**C.    The Berkshire Defendants Violated The Federal Securities Laws**

    **1.    Sections 5(a) and 5(c) of the Securities Act**

Count I of the Complaint alleges that the Berkshire Defendants violated Sections 5(a) and 5(c) of the Securities Act. These provisions forbid the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies. *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). Once the Commission introduces evidence establishing the *prima facie* elements of a Section 5 violation, the defendant bears the burden of proving the offering is exempt from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Murphy*, 626 F.2d at 641.

The Complaint alleges facts establishing the *prima facie* elements of a Section 5 violation are present and that no exemption from registration applies. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the Berkshire Offerings' securities and the transactions described above. (Complaint ¶ 47). From at least April 2006 through December 2007, the Berkshire Defendants used the instruments of interstate commerce to sell the Berkshire Offerings' unregistered shares to the public. (*Id.* ¶ 48).

No exemption from registration applied to any of these sales. The Berkshire Offerings' unregistered shares were offered and sold through general, nationwide solicitations to multiple investors in numerous states. Accordingly, exemptions for intrastate offerings (*e.g.*, Section 3(a)(11)) or private placements (*e.g.*, Section 4(2)) do not apply in this case. Because the shares were sold through general solicitation, Section 4(6) and Rules 505 and 506 are not available. Moreover, because more than $1 million worth of securities were sold, the exemption under Rule 504 is also unavailable.

Accordingly, the Complaint contains sufficient allegations establishing that the Berkshire

Defendants violated Sections 5(a) and 5(c) of the Securities Act.

### 2. The Anti-Fraud Provisions

Counts II and III of the Complaint allege the Berkshire Defendants violated Section 17(a) of the Securities Act and Count IV alleges that they violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. These anti-fraud provisions prohibit essentially the same conduct. *U.S. v. Naftalin*, 441 U.S. 768, 773 (1979); *SEC v. Holschuh*, 694 F.2d 130, 142-43 (7th Cir. 1982); SEC *v. Montana*, 464 F. Supp. 2d 772, 783-84 (S.D. Ind. 2006). To establish a violation, the Commission must show: (1) a misrepresentation or omission (2) that is material (3) made with scienter[1] (4) in the offer of or in connection with the purchase or sale of a security. *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992); *Montana*, 464 F. Supp. 2d at 783-84. As a fifth element, the Commission also must establish the use of interstate commerce, the mail, or a national securities exchange. *SEC v. Corporate Relations Group*, 2003 U.S. Dist. LEXIS 24925, at *24 (M.D. Fla. March 28, 2003).

The Complaint alleges facts establishing all of the elements of a Section 17(a) and Section 10(b) violation. First, it alleges facts demonstrating that over a period of a year and a half, the Berkshire Defendants repeatedly disseminated false or misleading statements to the public in the their PPMs and other materials concerning the use of proceeds and the management of Berkshire and the Berkshire Offerings.

Second, the Complaint alleges facts establishing the misrepresentations disseminated by the Berkshire Defendants were material. Courts generally consider a statement or omission to be material if "a reasonable man would attach importance to the fact misrepresented or omitted in

---

[1] Scienter is only required to prove violations of Sections 10(b) and 17(a)(1). Violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter. *Aaron v. SEC*, 446 U.S. 680, 697 (1980). The Commission may establish violations of these sections by showing negligence. *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3rd Cir. 1997); *Holschuh*, 694 F.2d at 143.

determining his course of action." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1327 (11th Cir. 1982); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Under that standard, the misstatements in the PPMs and other materials were clearly material. There is no doubt a reasonable investor would have thought it significant that, directly contrary to representations that were made, significant investor funds were being used for sales expenses, commissions, organizational expenses, and due diligence fees. A reasonable investor would also have thought it significant that considerable amounts of money were siphoned off to the Rose family to cover their personal expenses, including mortgages, home furnishings, cars, plastic surgery, and flying lessons. Finally, a reasonable investor would have thought it was significant that Jason Rose did not have any oil and gas experience and was not in fact the managing member of Berkshire, and that his father, who had been repeatedly disciplined for securities related violations, was running the operation from behind the scenes.

Third, the Complaint alleges facts establishing that the Berkshire Defendants displayed the requisite scienter. Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Seventh Circuit has concluded scienter may be established by a showing of knowing or reckless misconduct. *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008).[2] In this case, the Berkshire Defendants, acting through their principals, knew the PPMs discussing the use of investor proceeds and management by Jason Rose were false and misleading. *Montana*, 464 F. Supp. 2d at 784 ("A company may have imputed to it the scienter of the individuals who control it."); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3, 1097 n.18 (2d Cir. 1972).

---

[2] Although the Supreme Court has not ruled on whether reckless behavior is sufficient for civil liability under Section 10(b) and Rule 10b-5, it has noted that "every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2507 n. 3, 168 L. Ed. 2d 179 (2007).

Fourth, the Berkshire Defendants' misrepresentations occurred in connection with the sale of securities. Federal courts have adopted a liberal reading of this phrase, finding that any statement reasonably calculated to reach the average investor satisfies the "in connection with" requirement of Section 10(b) and Rule 10b-5. *Hasho*, 784 F. Supp. at 1106; s*ee also SEC v. Zandford*, 535 U.S. 813, 819-20 (2002) (upholding broad interpretation of "in connection with" language). The misrepresentations in the PPMs and other offering materials were directly calculated to reach the average investor and therefore satisfy the "in connection with" requirement. The dissemination of the PPMs and other materials also involved the use of interstate commerce. Accordingly, the Complaint contains sufficient allegations establishing that the Berkshire Defendants violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

**D.**     **Permanent Injunctive Relief Is Warranted Against the Berkshire Defendants**

The Commission is entitled to the issuance of a permanent injunction against the Berkshire Defendants pursuant to Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act. *See Montana*, 464 F. Supp. 2d at 786. Once a violation of the federal securities laws has been established, as in this case, "the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief." *Holschuh*, 694 F.2d at 144 (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)); *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). The Seventh Circuit in *Holschuh* observed:

> In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations.

694 F.2d 144; *see also Carriba Air*, 681 F.2d at 1322 (citing *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)); *SEC. v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984).

The totality of the circumstances surrounding the Berkshire Defendants' violations supports a finding of a reasonable likelihood of future violations. First, the Berkshire Defendants' actions were egregious. These entities played an instrumental part in the creation and dissemination of false and misleading information that was used to fraudulently raise millions of dollars from the sale of unregistered shares to the public. The false and misleading information in the PPMs and other materials caused a significant degree of harm to investors and to the integrity of the marketplace.

Second, this was not an isolated instance. The Berkshire Defendants repeatedly, from April 2006 through December 2007, were part of a distribution of materially false or misleading information to investors. These same factors demonstrate a high degree of scienter on the part of the Berkshire Defendants. The principals controlling the Berkshire Defendants knew that the representations regarding the use of proceeds and the management of the Berkshire and the Berkshire Offerings were materially false or misleading.

Finally, the Berkshire Defendants have not acknowledged any wrongdoing or provided any assurances that they will not play a role in future misconduct. Under the circumstances, there is every reason to believe that these entities will continue to violate the securities laws if the Court does not enjoin them. As a result, the facts of this case warrant the Court entering a permanent injunction against the Berkshire Defendants.

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Motion for Entry of a Default Judgment of Permanent Injunction against the Berkshire Defendants, permanently enjoining them from future violations of the federal securities laws. For the Court's convenience, a proposed default judgment is attached hereto

In addition, the undersigned counsel also requests that the Court grant an additional 120 days to seek authority from the Commission for a specific penalty amount, and to bring a motion before the Court for a Final Default Judgment imposing a penalty and requiring disgorgement of ill-gotten gains.

November 18, 2009                               Respectfully submitted,


                        By      s/C. Ian Anderson
                                  C. Ian Anderson
                                  Senior Trial Counsel
                                  New York Reg. No. 2693067
                                  Direct Dial: (305) 982-6317
                                  E-mail: andersonci@sec.gov
                                  ***Lead Counsel***

                                  Attorney for Plaintiff
                                  **SECURITIES AND EXCHANGE COMMISSION**
                                  801 Brickell Avenue, Suite 1800
                                  Miami, Florida 33131
                                  Telephone:   (305) 982-6300
                                  Facsimile:    (305) 536-4154

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 18, 2009, I electronically filed the foregoing document, along with attachments, with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document, along with attachments is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                s/ C. Ian Anderson
                                                C. Ian Anderson

## SERVICE LIST

Securities and Exchange Commission v. Berkshire Resources, LLC, et al.
Case No.  1:09-0704-SEB-JMS
United States District Court, Southern District of Indiana

Peter B. King, Esq.
Fowler White Boggs
501 East Kennedy Boulevard, Suite 1700
Tampa, FL 33602
Phone:  (813) 222-3316
peter.king@fowlerwhite.com
*Attorney for Yolanda C. Velazquez*

Cory J. Skolnick, Esq.
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202
Telephone: (502) 589-5400
Fax: (502) 581-1087
Email: cskolnick@fbtlaw.com
*Attorneys for Defendant Jason T. Rose
and Relief Defendants
Brian C. Rose and Joyce A. Rose*

Berkshire Resources, L.L.C.
Berkshire (40L), L.L.P.
Berkshire 2006-5, L.L.P.
Passmore-5, L.L.P.
Gueydan Canal 28-5, L.L.P.
Gulf Coast Development #12, L.L.P.
Drilling Deep in the Louisiana Water, J.V.
c/o Jason Rose
7301 Abbott Glen Drive
Crestwood, KY 40014
*Pro Se*