UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

CASE NO. 1:09-0704-SEB-JMS

SECURITIES AND EXCHANGE COMMISSION,

    **Plaintiff,**

v.

**BERKSHIRE RESOURCES, L.L.C.,**
**BERKSHIRE (40L), L.L.P.,**
**BERKSHIRE 2006-5, L.L.P.,**
**PASSMORE-5, L.L.P.,**
**GUEYDAN CANAL 28-5, L.L.P.,**
**GULF COAST DEVELOPMENT #12, L.L.P.,**
**DRILLING DEEP IN THE LOUISIANA WATER, J.V.,**
**JASON T. ROSE,**
**DAVID G. ROSE,**
**MARK D. LONG,**
**YOLANDA C. VELAZQUEZ,**

    **Defendants,**

**BRIAN C. ROSE AND JOYCE A. ROSE,**

    **Relief Defendants.**
_____/

## PLAINTIFF'S MOTION AND MEMORANDUM OF LAW TO SET DISGORGEMENT AND CIVIL PENALTY AMOUNT AS TO CERTAIN DEFENDANTS

  Plaintiff Securities and Exchange Commission moves the Court for a final judgment: (1) finding Berkshire Resources, L.L.C. ("Berkshire"), Berkshire (40L), L.L.P., Berkshire 2006-5, L.L.P., Passmore-5, L.L.P., Gueydan Canal 28-5, L.L.P., Gulf Coast Development #12, L.L.P., and Drilling Deep In the Louisiana Water, J.V. (the "Berkshire Offerings," and with Berkshire, the "Berkshire Defendants") jointly and severally liable for disgorgement of $15.4 million, plus prejudgment interest; (2) ordering Berkshire to pay a civil penalty of $650,000; and (3) dismissing the claim for civil penalties against the remaining Berkshire Defendants.

## FACTUAL AND PROCEDURAL HISTORY

The Commission brought this action to enjoin Berkshire, its principals Jason T. Rose and David G. Rose, the five limited liability partnerships and one joint venture through which Berkshire carried out an offering fraud (the Berkshire Offerings), and Mark D. Long and Yolanda Velazquez, Berkshire's head sales agents, from continuing to defraud investors through the sale of securities in violation of the federal securities laws. The Commission also named as relief defendants in the action Brian C. Rose and Joyce A. Rose.

As alleged in the Complaint, from April 2006 through December 2007, Berkshire raised at least $15.4 million from about 250 investors in the U.S. and Canada through a series of unregistered, fraudulent offerings of securities in the form of "units of participation" in the Berkshire Offerings. The Defendants marketed the Berkshire Offerings to the public through cold calls, and at trade shows and "wealth expositions." The purported purpose of the Berkshire Offerings was to fund oil and gas development projects that Berkshire was to oversee.

On November 20, 2009, the Court entered a Default Judgment of Permanent Injunction and Other Relief against the Berkshire Defendants (the "Judgment") [D.E. 45]. Among other things, the Court found the Berkshire Defendants were deemed to have admitted the allegations in the Complaint and that liability had been established against them [D.E. 45 at p.2]. The Judgment enjoined the Berkshire Defendants from future violations of the the anti-fraud and registration provisions of the federal securities laws [D.E. 45 at pp.2-5]. The Judgment also granted the Commission 120 days from the date of the order to file a motion for disgorgement and/or a civil penalty with respect to the Berkshire Defendants [D.E. 45 at p.5].

In support of this motion for disgorgement and a civil penalty, the Commission submits the declaration of Karaz S. Zaki, a certified public accountant in the Commission's Miami

Regional Office (attached as Exhibit A) evidencing the disgorgement the Berkshire Defendants should pay, along with the Commission's prejudgment interest calculation (attached as Exhibit B).

## MEMORANDUM OF LAW

### THE COURT SHOULD ORDER DISGORGEMENT, PREJUDGMENT INTEREST, AND A CIVIL PENALTY

**1.**     **Disgorgement and Prejudgment Interest**

Disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. First City Fin Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014 (1988); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-04 (2d Cir. 1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").   "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).   Where, as here, the fraud is "pervasive," the Court should order all profits stemming from the scheme to be disgorged. *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert. denied*, 479 U.S. 853 (1986).

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).   "The SEC's burden for showing the amount of assets subject to disgorgement . . . is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required] . . . .   Exactitude is not a requirement.'" *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 735 (11th Cir. 2005) (quoting *Calvo*,

378 F.3d at 1217).  The burden then shifts to the defendant to demonstrate the Commission's estimate is not a reasonable approximation.  *Calvo*, 378 F.3d. at 1217.  Moreover, in determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party."  *SEC v. First City Fin. Corp.,* 688 F. Supp. 705, 727 (D.D.C.1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989).

In addition, the Court may and should hold the Berkshire Defendants jointly and severally liable for the total amount of disgorgement and prejudgment.  "Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement."  *SEC v. Universal Express, Inc.*, 2009 WL 2486057, at *7 (S.D.N.Y. Aug. 14, 2009); *see also First Jersey Sec., Inc.*, 101 F.3d at 1475; *SEC v. JT Wallenbrock & Associates, et al.*, 440 F.3d 1109 (9th Cir. 2006); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (holding defendant jointly and severally liable for disgorgement); *SEC v. Berger*, 244 F. Supp.2d 180 (S.D.N.Y. 2001) (defendant jointly and severally liable because he conceived fraud and controlled corporate defendant).

As set forth in the Judgment, the Berkshire Defendants are deemed to have admitted the allegations of the Complaint [D.E. 45 at p.2].  *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).  As the Complaint details [D.E. 1], and as set forth in the Commission's default motion [D.E. 44], the Berkshire Defendants were all jointly instrumental in the offering fraud they carried out between at least April 2006 and December 2007 and all jointly benefited from the fraud.

2.       **The Complaint's Allegations Against the Berkshire Defendants**

A.       **The Defendants**

**Berkshire** was a Wyoming Limited Liability Company established in April 2006, with its principal place of business in Jeffersonville, Indiana.  (Complaint ¶ 8).  Berkshire purported to develop and operate gas and oil properties, and was the managing partner of the five limited liability partnerships and one joint venture described below (the Berkshire Offerings).  Berkshire has never been registered with the Commission in any capacity and has never registered any offerings of securities under the Securities Act of 1933 ("Securities Act") or any class of securities under the Securities and Exchange Act of 1934 ("Exchange Act").  (*Id.*).  Securities regulators in Washington and California issued cease-and-desist orders in March 2007 and June 2008, respectively, against Berkshire for fraud, offering unregistered securities, and employing unregistered sales agents. (*Id.*).

**David G. Rose**, 58, resides in Louisville, Kentucky.  (Complaint ¶ 9).  He is the father of Jason and Brian Rose and the former husband of Joyce Rose.  Rose exercised *de facto* control over Berkshire and the Berkshire Offerings.  (*Id.*).  State securities regulators in Kentucky, Oklahoma, and Massachusetts issued cease-and-desist orders against David Rose and other oil and gas companies associated with him in July 2005, February 2006, and April 2006, respectively, for fraud, offering unregistered securities, and employing unregistered sales agents.  (*Id.*).  He also has a disciplinary history for various state securities law violations in the late 1980s.  In January 2008, the United States Attorney's Office for the Western District of Kentucky secured an indictment against Rose for mail and wire fraud, alleging he defrauded investors in two oil and gas well projects through his company, enTerra Energy, L.L.C.  (*Id.*).

**Jason T. Rose**, 35, resides in Crestwood, Kentucky.  (Complaint ¶ 10).  He is identified in the Berkshire Offerings' materials as the "managing member" of Berkshire.  State securities regulators in Washington and California issued cease-and-desist orders against him in connection with Berkshire.  (*Id.*).

**Mark Long**, 52, resides in Louisville, Kentucky.  Long was the head of sales at Berkshire and ran Berkshire's sales office in Jeffersonville, Indiana. (*Id.* ¶ 17).

**Yolanda Velazquez**, 39, resides in Winter Park, Florida.  Velazquez was Berkshire's Client Services Director and ran Berkshire's sales office in Lake Mary, Florida.  (*Id.* ¶ 18).

**Berkshire (40L), L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 11).  It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Oklahoma and Louisiana.  Berkshire 40(L) has never registered any securities or offerings with the Commission.  It was also the subject of the Washington and California state actions against Berkshire described above.  (*Id.*).

**Berkshire 2006-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 12).  It purports to be a five-well, natural gas and crude oil drilling and development project, with wells located in Texas, Kansas, and Louisiana.  Berkshire 2006-5 has never registered any securities or offerings with the Commission.  It was also the subject of the California state action against Berkshire described above.  (*Id.*).

**Passmore-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2006. (Complaint ¶ 13).  It purports to be a five-well, natural gas and crude oil drilling project, with wells located in Texas.  It has never registered any securities or offerings with the Commission.  (*Id.*).

**Gueydan Canal 28-5, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2007.  (Complaint ¶ 14).  It purports to be a one-well, natural gas and crude oil drilling and

development project located in Louisiana.  It has never registered any securities or offerings with the Commission.  (*Id.*).

**Gulf Coast Development #12, L.L.P.** is a Wyoming Limited Liability Partnership organized in 2007.  (Complaint ¶ 15).  It purports to be a five-well natural gas and crude oil drilling and development project, with wells located in Texas.  It has never registered any securities or offerings with the Commission.  (*Id.*).

**Drilling Deep in the Louisiana Water, J.V.** is a Wyoming Joint Venture organized in 2007.  (Complaint ¶ 16).  It purports to be a four-well, natural gas and crude oil drilling and development project, with wells located in Louisiana.  It has never registered any securities or offerings with the Commission.  (*Id.*).

### B.     The Fraudulent Unregistered Offerings

In April 2006, David Rose formed Berkshire as a vehicle to raise capital, under the guise of developing and managing natural gas and crude oil properties.  (Complaint ¶ 24).  He installed his son, Jason Rose, as the head of the company, giving him the title "managing member."  (*Id.*).  Jason Rose was the public face of Berkshire and was held out as its lead manager with significant experience in the oil and gas industry.  In reality, Jason Rose had no experience managing an oil and gas company, and David Rose, Jason's father, ran the company behind the scenes.  (*Id.* ¶¶ 3, 25).

Berkshire formed and operated five limited partnerships and a joint venture that purportedly were involved with oil and gas development projects in Kansas, Louisiana, Oklahoma, and Texas.  (Complaint ¶ 26).  Berkshire was the managing partner of each of the partnerships and the joint venture, with responsibility for the drilling and operation of each project.  (*Id.*).

Between April 2006 and December 2007, Berkshire raised approximately $15.5 million from the offer and sale of "units of participation" in the Berkshire Offerings to approximately 265

investors in the U.S. and Canada.  (Complaint ¶¶ 2, 28).  No registration statement was filed or in effect with the Commission for the securities.  The Berkshire Offerings ranged in size from 14 to 137 investors per offering.  (*Id.* ¶ 28).

Berkshire marketed the offerings at trade shows and "wealth expositions."  (Complaint ¶ 29).  The typical sales pitch was that Berkshire was "the best in the business," that it had a "foolproof" investment opportunity, and that investors would receive a "quick payback" on their investment.  (*Id.*).  At these trade shows and wealth expositions, the Defendants, including David Rose, took some prospective investors to private hotel suites for one-on-one meetings during which they gave investors offering materials and subscription agreements for the particular partnership or joint venture.  (*Id.*).

Berkshire also marketed the offerings through cold calls their sales agents made from two boiler-room type sales offices.  (Complaint ¶ 30).  Berkshire hired Long to run its Jeffersonville, Indiana operation, and tapped Velazquez to head up the Lake Mary, Florida operation.  (*Id.*).

After meeting with prospective investors, Berkshire sent them a private placement memorandum ("PPM") for the particular partnership or joint venture in which they were being solicited, a purchaser suitability questionnaire, and a subscription and customer agreement. (Complaint ¶ 31).  Some investors also received a DVD detailing Berkshire's background and experience in the oil and gas industry.  (*Id.*).

**C.    Misrepresentations and Omissions**

**(1).    False and Misleading Statements Regarding the Use of Proceeds**

Berkshire's sales agents told prospective investors the Defendants would use 100 percent of their money to fund the partnerships and joint venture, and to run the oil and gas development projects.  (Complaint ¶ 37).  The Defendants reiterated this representation in the PPMs.  (*Id.*).  The

offering materials, with one exception, also explicitly stated the Defendants would not use any funds for sales expenses, commissions, organizational expense, or due diligence fees. (*Id.*).

In direct contravention of these representations, Berkshire spent at least $6.7 million of investor funds for exactly these purposes. (Complaint ¶ 38). Of this amount, approximately $1.3 million in investor funds went directly to the Rose family, including at least $160,000 to Jason Rose, $431,000 to Brian Rose, $192,000 to Joyce Rose, and $56,000 to David Rose. The Defendants used another $255,000 to cover personal charges the Rose family made on David Rose's American Express Black card. An additional $203,000 covered other miscellaneous credit card charges. (*Id.*). The Rose family used investor money as their own personal slush fund to pay for mortgages, home furnishings and electronics, cars bought at auction, plastic surgery for David Rose, flying lessons for Brian Rose, and a Kentucky Derby party at Churchill Downs. (*Id.*).

Berkshire improperly used approximately $3.6 million of investor money to fund its payroll, including paying salaries of employees and consultants, and to make commission payments to Long, Velazquez, and other Berkshire sales agents. (Complaint ¶ 39). In addition, contrary to what the Defendants and their sales agents told investors, Berkshire used approximately $1.83 million of investor funds to pay for various business expenses, including marketing and promotional materials, advertising, and shipping costs. (*Id.*).

### (2).   Misrepresentations Regarding the Management of Berkshire

The Berkshire Offerings' PPMs misled investors about who was managing the company's operations. (Complaint ¶ 40). While the offering materials stated Jason Rose managed and operated Berkshire and the Berkshire Offerings, Jason Rose did nothing more than send offering materials to investors. (*Id.*). David Rose was the real operating force behind the company and its offerings. He formed Berkshire and set it up to operate exactly like his previous oil and gas

9

companies, and told Jason Rose he would be "managing member." (*Id.* ¶ 41). Despite the fact that he did not have signatory authority on any of Berkshire's bank accounts, David Rose wrote and signed checks drawn on Berkshire's operating account for his benefit on multiple occasions. (*Id.* ¶ 42).

The Berkshire Offerings' PPMs, as well as the DVD provided to some investors, held Jason Rose out as the managing member of Berkshire. (Complaint ¶ 43). The company's materials claimed he "earned accolades for his tremendous attention to every detail, including research into hundreds of drill sites and hand picking the select few that Berkshire Resources ultimately drilled." The offering materials also asserted that Jason Rose would be responsible for "coordinating the acquisition of oil and gas properties and leases, funding, drilling, completing and operating wells." (*Id.*).

Similarly, sales agents told prospective investors that Jason Rose had been involved in the evaluation, site selection and drilling of "70 oil and/or natural gas wells" in the previous three years alone, and that he "hit 63 of the 70 wells drilled . . . for an incredible industry benchmark of 90 percent." (Complaint ¶ 44). A list of all of the wells Jason Rose purportedly "hit" during his time in the oil and gas industry was attached to the PPMs. (*Id.*).

In truth, Jason Rose's only experience in the oil and gas industry was limited to manual tasks such as painting batteries, setting up pump jacks, and laying gas lines. (Complaint ¶ 45). He was paid a salary as Berkshire's "managing member" merely to show up to the Jeffersonville office, where he helped send out PPMs and other offering materials. Meanwhile, his father, David Rose, ran the company behind the scenes. (*Id.*).

3.   __Amount of Disgorgement and Prejudgment Interest As To the Berkshire Defendants__

As reflected in the bank records of the Berkshire Defendants and related entities, including monthly statements, cancelled checks, deposit records, and wire detail, approximately $15.4 million was raised from an estimated 250 investors (Ex. A at ¶¶ 3-5). This $15.4 million represents ill-gotten gains the Berkshire Defendants received as a result of their fraudulent conduct. Accordingly, based on the allegations in the Complaint and the Berkshire Defendants' already established liability, it is appropriate that this Court should order the Berkshire Defendants, jointly and severally, to disgorge this amount plus pre-judgment interest. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997); *SEC v. Universal Express, Inc.*, 2009 WL 2486057, at *7 (S.D.N.Y. Aug. 14, 2009); *SEC First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996); *SEC v. JT Wallenbrock & Associates, et al.*, 440 F.3d 1109 (9th Cir. 2006).

For cases in which a securities law violator has enjoyed access to funds over a period of time as a result of his or her wrongdoing, requiring the wrongdoer to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997). A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness. *SEC v. Tome*, 638 F. Supp. 638, 639 (S.D.N.Y. 1986).

The Commission calculated pre-judgment interest in accordance with the delinquent tax rate established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, from June 8, 2009 (the date of the Complaint) to November 20, 2010 (the date of the Judgment). Based on the principal amount of $15.4 million in ill-gotten gains, applying the IRS tax rate results in a total prejudgment interest amount of $205,846.67, for a total disgorgement

obligation of $15,605,846.67.  *See SEC v. Poirier*, 140 F. Supp. 2d 1033, 1047 (D. Ariz. 2001). The Commission attaches its Prejudgment Interest Report for the Berkshire Defendants as Exhibit B.

**5.      The Court Should Impose A Civil Penalty on Berkshire**

The Commission seeks a civil penalty of $650,000 against Berkshire pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act, each of which establishes the same three tiers of potential penalties.

Under the First Tier for both statutes, the Court may impose a penalty of up to (i) $65,000 on an entity for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation.  Under the Second Tier, the Court may impose a penalty of up to (i) $325,000 on an entity for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation.  The Second Tier applies where the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. Finally, under the Third Tier the Court may impose a penalty of up to (i) $650,000 on an entity for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation.[1]  *SEC v. KS Advisors, Inc.*, 2006 WL 288227, at *3 (M.D. Fla. Feb. 6, 2006).  The Third Tier applies to cases in which the requirements of a Second Tier penalty are present *and* the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

Berkshire's conduct merits a maximum third-tier penalty because, based on the Complaint's allegations, which the Court must deem true for purposes of this motion, its conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

---

[1]  The figures for all three tiers come from the Federal Civil Penalties Inflation Adjustment Act of 1990, which adjusted the potential penalty amounts to account for inflation, based on violation dates.  17 C.F.R. Pt. 201, §§ 201.1001-1002, Tbl. II to Subpt. E, 66 FR 8761 at * 8662-63.

requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Meadows v. SEC*, 119 F.3d 1219, 1228 (5th Cir. 1997). *See also SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1373 (S.D. Fla. 1999) (imposing third-tier penalties because, among other things, defendants' failure to register their securities with the Commission created a substantial risk the investors would lose their investments); *SEC v. Hilker*, No. 03-CV-01338, 2007 WL 174091 at *3 (D. Colo. Jan. 18, 2007) (court imposed third tier civil penalties based on complaint's allegation that defendants' fraudulent conduct created a significant risk of substantial losses to investors).

As the primary entity through which the individual defendants carried out the fraud, Berkshire was involved in all of the fraudulent representations and omissions to investors. Berkshire was the managing partner of each of the partnerships and the joint venture, and was responsible for the drilling and operation of each project.  The individual defendants used Berkshire to market the Berkshire Offerings, to distribute private placement memoranda for the particular partnership or joint venture, and to convince investors that Berkshire's management had experience and expertise that was in fact lacking.  Berkshire's conduct involved fraud and deceit, and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Meadows,* 119 F.3d at 1228.   Accordingly, Berkshire's central role in the offering frauds, as detailed in the Complaint, justifies imposing a Third-tier penalty of $650,000.   This amount is also appropriate and proportional to the amount of disgorgement in this case.

## **CONCLUSION**

**WHEREFORE**, the Commission respectfully requests that the Court (1) enter a Final Judgment against the Berkshire Defendants ordering them, jointly and severally, to disgorge $15.4 million in ill-gotten gains, plus prejudgment interest of $205,846.67, for a total

disgorgement obligation of $15,605,846.67; (2) order Berkshire to pay a $650,000 civil penalty; and (3) dismiss the claim for civil penalties against the remaining Berkshire Defendants.  A proposed Final Judgment is submitted with this motion.


March 15, 2010                              Respectfully submitted,


                              By      s/C. Ian Anderson
                                      C. Ian Anderson
                                      Senior Trial Counsel
                                      New York Reg. No. 2693067
                                      Direct Dial:  (305) 982-6317
                                      E-mail: andersonci@sec.gov
                                      ***Lead Counsel***

                                      Attorney for Plaintiff
                                      **SECURITIES AND EXCHANGE COMMISSION**
                                      801 Brickell Avenue, Suite 1800
                                      Miami, Florida  33131
                                      Telephone: (305) 982-6300
                                      Facsimile:(305) 536-4154

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 15, 2010, I electronically filed the foregoing document, along with attachments, with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document, along with attachments is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ C. Ian Anderson
C. Ian Anderson

## SERVICE LIST

Securities and Exchange Commission v. Berkshire Resources, LLC, et al.
Case No.  1:09-0704-SEB-JMS
United States District Court, Southern District of Indiana

Peter B. King, Esq.
Fowler White Boggs
501 East Kennedy Boulevard, Suite 1700
Tampa, FL 33602
Phone:  (813) 222-3316
peter.king@fowlerwhite.com
*Attorney for Yolanda C. Velazquez*

Cory J. Skolnick, Esq.
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202
Telephone: (502) 589-5400
Fax: (502) 581-1087
Email: cskolnick@fbtlaw.com
*Attorneys for Defendant Jason T. Rose
and Relief Defendants
Brian C. Rose and Joyce A. Rose*

Berkshire Resources, L.L.C.
Berkshire (40L), L.L.P.
Berkshire 2006-5, L.L.P.
Passmore-5, L.L.P.
Gueydan Canal 28-5, L.L.P.
Gulf Coast Development #12, L.L.P.
Drilling Deep in the Louisiana Water, J.V.
c/o Jason Rose
7301 Abbott Glen Drive
Crestwood, KY 40014
*Pro Se*